IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TOMMY JAMES JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:14-cv-1205-TFM |
| | ) | [wo] |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On July 20, 2010, Tommy James Johnson ("Plaintiff" or "Johnson") applied for

supplemental security income under Title XVI and disability insurance benefits under Title II

of the Social Security Act ("the Act"). (Tr. 137-38). These applications were initially denied

on October 16, 2010. (Tr. 137-38). Following a timely written request for hearing, Johnson

testified via video on November 29, 2011 before the administrative law judge ("ALJ"). (Tr.

97). During this hearing, the ALJ issued a continuance so that Johnson could seek counsel.

(Tr. 104-105). On April 9, 2012, Johnson again testified before the ALJ by video. During

the second hearing, the ALJ issued a continuance in order for Johnson to review the evidence

in the record. (Tr. 92-93). Again on October 17, 2012, Johnson appeared and testified via

video before the ALJ. (Tr. 61). A supplemental hearing was held on January 7, 2013 where

Johnson again testified before the ALJ via video. (Tr. 35). The ALJ rendered an unfavorable

decision on February 8, 2013. (Tr. 12). The Appeals Council denied Plaintiff's request for

review.   (Tr. 1).   As a result, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").  *Id.*  Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c).  After careful scrutiny of the record and briefs, for reasons herein explained, the Court AFFIRMS the Commissioner's decision.

## I. Nature of the Case

Johnson seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits and social security income.  United States District Courts may conduct limited review of such decisions to determine whether they comply with applicable law and are supported by substantial evidence.  42 U.S.C. § 405.  The Court may affirm, reverse and remand with instructions, or reverse and render a judgment.  *Id.*

## II. Standard of Review

The Court's review of the Commissioner's decision is a limited one.  The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied.  *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

 "The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)).  Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion  of the existence of a fact, and

must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).  The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  There is no presumption that the

Commissioner's conclusions of law are valid.  *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III.  STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[1]  *See* 42 U.S.C. § 423(a).  The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program.  SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.[2]  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n. 1 (11th Cir. 1986).  Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  A person is entitled to disability benefits when the person is unable to

---

[1] DIB is authorized by Title II of the Social Security Act, and is funded by Social Security taxes. *See* Social Security Administration, Social Security Handbook, § 136.1, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

[2] SSI benefits are authorized by Title XVI of the Social Security Act and are funded by general tax revenues.  *See* Social Security Administration, Social Security Handbook, §§ 136.2, 2100, *available at* http://www.ssa.gov/OP_Home/handbook/handbook.html

Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010).

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying for

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id.* at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[4] ("grids") or hear testimony from a vocational expert ("VE"). *Id.* at 1239-40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id.*

## IV. ADMINISTRATIVE FINDINGS AND CONCLUSIONS

Johnson was forty-five years old with an eleventh grade education when the ALJ rendered his decision. (Tr. 69). Johnson testified at all the hearings on this matter before the ALJ. (Tr. 35, 61, 88, and 97). At the third hearing on this matter on October 17, 2012,

---

[4] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

Johnson stated that this past work included the jobs of laborer and hand grinder.  (Tr. 70-71).

When questioned as to why he was unable to perform full-time work, Johnson explained he

suffers from back pain, seizures, and difficulty sleeping.  (Tr. 72, 74).  Johnson testified that

he has had about seven or eight seizures per month since 2008 and that he has fewer seizures

when taking Dilantin.  (Tr. 75).

On a scale from one to ten -- where ten is the worst pain, Johnson reported that his

pain was an 8 with medication.  (Tr. 76).  Johnson noted that standing and walking for a  long

period of time made his back pain worse and that he has trouble sleeping due to his pain.  (Tr.

76).  Johnson further testified that he can stand less than 10 minutes due to muscle spasms in

his back and left leg.  (Tr. 76-77).  He said that he can walk only about two blocks due to

numbness in his leg.  (Tr. 76-77).  He also said that he can only sit for 20 to 30 minutes

before he needs to lie down.  (Tr. 77).  Johnson testified that he uses a cane which was

prescribed by the doctor who performed his back surgery in 1996.  (Tr. 78).  He also testified

that he hears voices, and that he takes medication for this psychological impairment.  (Tr.

79).  Finally, Johnson noted that he experiences pain in his left hand. (Tr. 79).

At the fourth hearing held on January 7, 2013, Johnson testified that he experiences

seizures about twice a week.  (Tr. 44).  Johnson further testified that during these seizures he

loses consciousness and that he takes Dilantin for his seizures.  (Tr. 44).   Johnson also

testified that he has no medical insurance. (Tr. 45-46).

A vocational expert, Jody Skinner, testified in Johnson's third hearing on October 17,

2012. (Tr. 80). Skinner recognized that Johnson's past work consisted of the jobs of poultry laborer (DOT Code 411.687-018), grinder (DOT Code 602.382-034), and lumber handler (DOT Code 922.687-070). (Tr. 81). During the administrative hearing, the ALJ questioned Skinner whether a hypothetical individual with the same age, educational background, and work experience as Johnson with certain limitations, including "lift[ing] and/or carry[ing] 20 pounds occasionally, 10 pounds frequently" and "stand and/or walk for six hours", with a "sit/stand" option "every 60 minutes" and "frequent balancing" but "occasional stooping . . . . kneeling . . . crouching and crawling", could perform Plaintiff's past work. (Tr. 81-82). Skinner testified that the hypothetical individual would be unable to perform Johnson's past work (Tr. 82), but that the individual would be able to perform the jobs of a car wash attendant (DOT Code 915.667-010), garment folder (DOT Code 789.687-066) and garment bagger (DOT Code 920.687-018). (Tr. 83).

The ALJ also posed a second set of restrictions on the same hypothetical individual including, "lift[ing] and/or carry[ing]" 10 pounds occasionally, and "items of negligible weight frequently" and "stand and/or walk two hours" with "sit/stand" option for "30 minutes at a time" and only "occasionally balancing" and inquired whether that hypothetical individual could perform Plaintiff's past work. (Tr. 83). Again Skinner testified that the hypothetical individual would be unable to perform Johnson's past work (Tr. 84), but that the individual would be able to perform the jobs of an assembler (DOT Code 706.684-030), surveillance system monitor (DOT Code 379.367-010), and call out operator (DOT Code 237.367-014). (Tr.84). The ALJ posed the same hypothetical as above with one change to

the residual functional capacity which dealt with Plaintiff's ability to "sustain concentration and attention". (Tr. 84). This time Skinner opined that the hypothetical individual would be unable to perform Plaintiff's past work or any other work. (Tr. 84).

Another vocational expert, Sue Ann Berthune, testified at the fourth hearing held on January 7, 2013. (Tr. 47). Berthune stated that Johnson's past work consisted of the jobs of farm hatchery worker (medium, semi-skilled), laborer at a lumber company (heavy, semi-skilled), and house labor work (medium, unskilled). (Tr. 49). During the administrative hearing, the ALJ questioned Berthune whether a hypothetical individual with the same age, educational background, and work experience as Johnson with certain limitations, including "lift[ing] and/or carry[ing] 20 pounds occasionally, 10 pounds frequently" and "stand and/or walk for four hours", "sit for six hours," with a "sit/stand" option "every 60 minutes" and "four hours of balancing" but "occasional stooping . . . kneeling . . . crouching and crawling", could perform Plaintiff's past work. (Tr. 51-55). Berthune testified that the hypothetical individual would be unable to perform Johnson's past work (Tr. 55), but that the individual would be able to perform the jobs of a "small parts assembler (DOT Code 706.684-022), surveillance system monitor (DOT Code 379.367-010), bonder (DOT Code 726.685-066), microfilm processor (DOT Code 976.385-010), and packaging line worker (DOT Code 521.687-086). (Tr. 55-57).

The ALJ also posed a second set of restrictions on the same hypothetical individual including, "lift[ing] and/or carry[ing]" 10 pounds occasionally, and "items of negligible weight frequently" and "stand and/or walk two hours" with "sit/stand" option for "30 minutes

at a time" and only "occasionally balancing" and inquired whether that hypothetical individual could perform Plaintiff's past work.  (Tr. 57-58).  Again Skinner testified that the hypothetical individual would be unable to perform Johnson's past work and further opinioned that this hypothetical individual would be unable to perform any job. (Tr. 58). When questioned whether the first hypothetical individual "[i]nstead of being able to sustain concentration and attention for two hour periods with customary breaks this person - - let's assume this person can sustain concentration and attention for one hour periods with five minute breaks,  Berthune testified that the hypothetical individual would be unable to perform Johnson's past work and would be unable to perform any job.  (Tr. 58-59).

## V. MEDICAL HISTORY

The medical records show that from 1987 through 2012, Plaintiff was treated primarily in the Southeast Alabama Medical Center Emergency Room for a variety of medical conditions or injuries.  (Tr. 480-697).[5]  Specifically, in January 1987, Plaintiff reported to the Emergency Room with abdominal pain and vomiting.  (Tr. 570).   In December 1987, Plaintiff was admitted to the hospital for treatment of facial trauma after a large firecracker exploded in his face.  (Tr. 513).  In February 1993, Plaintiff again was seen at the Emergency Room for a toothache.  (Tr. 575).

---

5As the ALJ correctly recognized in his opinion, the period at issue before this Court is from February 2009 through February 8, 2013, for Plaintiff's Title II claim and from July 20, 2010, through February 8, 2013 for Plaintiff's Title XVI claim.  (Tr. 15).  Thus, the Court agrees with the ALJ that evidence generated prior to February 2009 is not relevant to this consideration but is "considered strictly to provide context for the claimant's allegations and the current evidence." (Tr. 15).

In July 1994, Plaintiff was treated at the Emergency Room for "black out spells" (Tr. 566) and a CT scan of his brain showed a "normal unenhanced brain" (Tr. 573). In November 1994, Plaintiff was seen for back pain (Tr. 566-567). In March 1995, Plaintiff again reported to the Emergency Room complaining of "numbness buttock and back". (Tr. 554). An X-Ray report showed an "unremarkable lumbar spine". (Tr. 558). In August 1995, Plaintiff presented to the Emergency Room for treatment resulting from injuries received from being hit in the face by a basketball. (Tr. 541). In November 1995, Plaintiff again was seen at the Emergency Room for back pain. He reported that he had back surgery "in which they trimmed a disc" several months ago. He complained of "tingling in his back, little sharp pain is a little worse than unusual." (Tr. 536).

In June 1997, Plaintiff again reported to the Emergency Room for treatment for a "facial laceration" and "nasal fracture" which he received while playing basketball. (Tr. 508). In January 1998, Plaintiff presented to the Emergency Room complaining of back pain; he was instructed to take "Tylenol, Advil, Aleve, etc. for pain." (Tr. 500). Then in February 1998, Plaintiff was seen at the Emergency Room again for "chronic back pain"; "mild tenderness" was "noted upon palpation of the lower paralumbar muscular area at about the L4-5 area." (Tr. 502). He was instructed to return to work for "limited duties" and to see his orthopedic doctor. (Tr. 506).

In January 1999, Plaintiff was seen in the Emergency Room for treatment of a cyst on his face. (Tr. 492). Later in March 1999, Plaintiff was seen in the Emergency Room for treatment of a stab wound to his right forearm. (Tr. 481). In May 2000, Plaintiff presented

to the Emergency Room for treatment resulting from an assault where he received cuts to his face.  He listed his home medications as muscle relaxers and Motrin.  (Tr. 654).  In June 2000, Plaintiff reported to the Emergency Room complaining of back pain that "radiates down right hip and leg" for which he was prescribed Toradol.  (Tr. 647).  In July 2000, an X-Ray report of his lumbar spine showed "slight increased density at the L5-S1 vertebral body which probably represents some early degenerative changes", but no "acute fractures, subluxation, or interval change" was noted.  (Tr. 643).

In December 2007, Plaintiff presented to the Emergency Room complaining of back pain.  An X-ray of the lumbar spine noted "normal alignment.  Endplate irregularity and sclerosis at L5-S1.  This is compatible with degenerative disc disease." (Tr. 640).  In January 2008, Plaintiff sought treatment at the Emergency Room complaining of "bumps on left face, back spasms, growth under both feet." (Tr. 624).  In October 2008, Plaintiff again reported to the Emergency Room for treatment of a knife wound. (Tr. 614).  In April 2009, an X-ray report showed "phleboliths . . . in the left aspect of the pelvis, no change.  Degenerative changes, worse at L5-S-1.   No antero or retrolisthesis.   No compression deformity.  IMPRESSION: NO CHANGE COMPARED TO 2007 EXAM." (Tr. 612).  Later in April 2010, an X-ray report of the lumbar spine showed *"Advanced degenerative changes L4-5, L5-S1.  No fracture or displacement."* (Tr. 610).  (Emphasis Added).  In November, 2011, Plaintiff reported to the Emergency Room complaining of losing consciousness, headache, chest pain and numbness.  Plaintiff's history notes that he takes Dilantin three times a day for seizure disorder-epilepsy.  (Tr. 587).  From November 29, 2011 until December 6, 2011,

Plaintiff was seen by a family practitioner at Headland family medicine.  (Tr. 456-479).  The following medical conditions were noted, epilepsy, back, leg, chest and head pain. (Tr. 466).  It was further noted that Plaintiff's medications included Dilantin and Lortab.  (Tr. 466).

At some point in early 2008 Plaintiff was arrested and incarcerated.  In January 2008, orders were given that he be given a "bottom bunk/bottom tier & extra mat" because of previous "back surgery".  (Tr. 424).  The Prison Intake records list no current medicines or any hospitilizations.  (Tr. 422).  The Prison records reflect that in February 2008, he was seen for pain in his left hand and an appointment was made with O.H. Chitwood, M.D. at Southern Bone and Joint in Dothan, Alabama.  (Tr. 419-421).  The records also reflect that use of Dilantin was prescribed (Tr. 420), and that Plaintiff's last seizure occurred November, 2007.  (Tr. 422).

In March 2008, Plaintiff saw Dr. Chitwood, M.D. for the left ring finger pain.  He was diagnosed with "chronic boutonniere deformity".  The doctor noted that "[w]e discussed the options right now as long as it is not causing significant problems, I would leave it alone.  He stated agreement with this plan."  (Tr. 383, 697).  The doctor also noted that they discussed his low back and leg pain and reported that Plaintiff "says it bothers him off and on.  I reviewed his lumbar spine films done at the hospital and they showed *severe DJD of L5-S1*.  I have discussed with him that if this gets worse, the next step would be to get an MRI of his back.  That can be done through the prison system if needed."  (Tr. 383). (Emphasis Added).

The prison treatment records provided also show from early 2008 until mid-2010 that Plaintiff complained numerous times of back pain, leg numbness and seizures and sought

treatment for other minor conditions.  The records further show medications prescribed including Tylenol, Naprosyn, Motrin, Flexeril, for back pain and Dilantin for seizures.  (Tr. 385-424).  Additionally, the records show that the back pain would improve from time to time, but that it would also return.  (Tr. 399).

On September 14, 2010, Plaintiff presented to Sam R. Banner, D.O., for a physical consultative examination.  (Tr. 425-430).  Dr. Banner noted that "[r]adiological testing of the lumbar spine showed generalized decrease in the height of L5; *marked narrowing of L5-S*1 disc space, *mild proliferative changes at L5 and S1* and early proliferative change at L4." (Tr. 428, 429) (Emphasis added).  Dr. Banner relied upon the report of Dr. Donna H. West, radiologist, for specific findings made above.  (Tr. 428, 429).  With respect to his physical examination of Plaintiff's back, Dr. Banner noted "[n]o paravertebral spasm noted on exam; Flattened lumbar lordosis and ROM 60 degrees forward bending, 10 degrees backward bending, 20 degrees lateral flexion bilateral and 15 degrees rotation bilateral." (Tr. 427).  As for the physical examination of Plaintiff's locomotor, Dr. Banner noted "[p]atient demonstrated no pain or difficulty getting on or off the table; Patient is able to walk normal step, height and length without any deviation form straight line; No evidence of ataxia, Minimal squat; A tandem/heel to toe was performed satisfactorily.  No evidence of ataxia." (Tr. 427).

On September 23, 2010, Plaintiff presented to David C. Ghostley, Psy.D., for a psychological examination.  (Tr. 431-432).  Dr. Ghostley diagnosed "Depressive Disorder NOS due to Pain." (Tr. 432).  Dr. Ghostley stated that he reviewed the medical evidence of

record and opined "Mr. Johnson's ability to function independently and manage finances is unimpaired.  Presently, his ability to understand, remember, and carry out instructions, as well as to respond appropriately to supervisors, co-workers, and work pressures in a work setting is mildly to moderately impaired by pain." (Tr. 432).  The Mental RFC Assessment dated October 14, 2010 from Linda Duke, Ph.D reflects Moderate limitations Plaintiff's ability "to understand and remember detailed instructions"; "to carry out detailed instructions"; "to maintain attention and concentration for extended periods"; "to interact appropriately with the general public"; "to respond appropriately to changes in the work setting."  (Tr. 448-449).  Beginning in January 23, 2012, Plaintiff received psychiatric treatment and counseling from SpectraCare with the goal of eliminating antisocial behavior by January 23, 2013. (Tr. 673).  Plaintiff's noncompliance was noted. (Tr. 674).  Plaintiff's treatment was terminated in July, 2012.  (Tr. 663-665).

## VI.  ISSUES

Johnson raises two issues for judicial review:

1)  The Commissioner's decision should be reversed because the ALJ's residual functional capacity fails to include any limitations regarding Mr. Johnson's need of a cane for ambulation.

2)  The Commissioner's decision should be reversed because the ALJ failed to properly apply the pain standard.

## VII. ANALYSIS

### 1. JOHNSON'S NEED FOR A CANE

Johnson argues that the ALJ erred by failing to include any limitations concerning Johnson's need to use a cane to walk in the residual functional capacity. A residual functional capacity assessment is used to determine a claimants' capacity to do as much as they are possibly able to do despite their limitations. *See* 20 C.F.R. § 404.1545(a)(1) (2010). An RFC assessment will be made based on all relevant evidence in the case record. *Id.*; *Lewis v.* 125 F.3d at 1440.

At an ALJ hearing, "the [ALJ] is responsible for assessing [the claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c) (2010). The claimant is "responsible for providing the evidence [the ALJ] will use to make a finding about [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(a)(3) (2010). The ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [their] own medical sources. *Id.; Holladay v. Bowen,* 848 F.2d 1206, 1209-10 (11th Cir. 1988) (The ALJ is not required to order a consultative examination unless the record establishes it is necessary to render a fair decision). The ALJ's finding must be supported by substantial evidence. "Substantial evidence is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart,* 405 F.3d 1208, 1211 (11th Cir. 2005). (Citations omitted).

The Court has carefully and independently reviewed all the medical evidence of record. None of the medical records before the Court indicate that Plaintiff was ever prescribed a cane. Rather the only evidence before the Court that Plaintiff needed a cane for ambulation comes from his own personal testimony and observations about his use of a cane.

Plaintiff appeared at the October 17, 2012 hearing with a cane and testified that it was prescribed by Dr. Rhine, the surgeon that performed his back surgery in 1996. (Tr. 78). During the September 14, 2010 consultative physical examination, Plaintiff ambulated with a cane, which he reported was ordered by his neurosurgeon. (Tr. 22, 425). Plaintiff also walked with a cane during the September 23, 2010 consultative psychological examination. (Tr. 431). However, the records from Plaintiff's imprisonment do not show that Plaintiff ever used a cane. (Tr. 385-424). Moreover, even if the Court were to accept Plaintiff's testimony that he was prescribed a cane in 1996, this evidence does not establish that Plaintiff's condition required that he use a cane from February 2009 through February 2013, the only time-period relevant to this matter. Thus, the Court concludes that Plaintiff has failed to meet his burden of proving that he needed a cane to walk and therefore his argument concerning the ALJ's failure to incorporate this need into the RFC finding fails. *Moore*, 405 F.3d at 1211.

## 2.     THE ALJ'S CREDIBILITY DETERMINATION

The law is well-settled; in order to establish disability based on testimony of pain and other symptoms, the claimant must demonstrate (1) evidence that an underlying medical

condition exists *and either* (2) objective medical evidence confirming the severity of the alleged pain *or* (3) that the objectively determined medical condition can reasonably be expected to cause the alleged pain. *See Holt v. Sullivan,* 921 F. 2d 1221, 1223 (11th Cir. 1991). (Emphasis Added).  The ALJ retains discretion not to credit the claimant's testimony of pain and other symptoms.  However, when the ALJ decides not to fully credit the claimant's testimony, the ALJ must articulate the reasons for that decision.  *Id.*  In other words, even where the medical record includes objective evidence of pain, and where the ALJ acknowledges that the claimant experiences some pain, the ALJ may conclude that the degree of pain is not disabling in light of all the evidence.  *See Macia v. Bowen*, 829 F. 2d 1009, 1011 (11th Cir. 1987).  Indeed, it is not inconsistent for the ALJ to find a claimant suffers pain, and yet is not so severely impaired as to meet the stringent test for disability imposed by the Act.  *See Arnold v. Heckler,* 732 F. 2d 881, 884 (11th Cir. 1984).

In his decision, the ALJ specifically identified the pain standard and summarized the medical evidence of Plaintiff's back pain and seizures.  (Tr. 21-24).  The ALJ noted that Plaintiff "received little treatment for these conditions during the period at issue".  (Tr. 21). The ALJ further noted that Plaintiff had used Ultram, Tylenol, Motrin and Medrol for back pain and Dilantin to control seizures.  (Tr. 21).  The ALJ specifically pointed to the medical evidence confirming "advanced degenerative changes at L4-5 and L5-S1 with no fracture or displacement." to confirm the severity of Plaintiff's condition (Tr. 22).

The ALJ noted that Plaintiff claimed that he had "frequent seizures", specifically "seizures occurring regularly since 2008".  However, the ALJ correctly recognized the prison

records do not reflect that Plaintiff had any seizures during that time and that the medical records reflect the seizure in November 2011 occurred because he was not taking his medications.  Further the ALJ correctly stated that the record does not reflect Plaintiff has suffered any seizures since November 2011.  (Tr. 22).

After a detailed recitation of Plaintiff's medical history, the ALJ stated that "[a]lthough the medical evidence does not support the claimant's allegations of disabling symptoms, he credibly has some pain and limitations resulting from the severe physical impairments."  (Tr. 23).  The ALJ further stated that he discounted Plaintiff's testimony of disabling pain on the basis of the medical evidence, Plaintiff's inconsistent statements about the use of a cane[6], as well as inconsistent statements about his daily activities, and his inconsistent work history prior to the onset date[7]."  (Tr. 24).  The ALJ concluded "[i]n sum, the substantial weight of the evidence, including the objective findings from examination and testing and the infrequent and conservative treatment claimant has received support a finding that the claimant can perform a reduced range of light work."  (Tr. 25).  Thus, the Court concludes that the ALJ properly applied the pain standard in this case.  *See Holt,* 921 F.2d at 1223.   Moreover, on the basis of the Court's thorough and independent review of the evidence, including the medical and other record evidence, the Court concludes that the ALJ's conclusion that Plaintiff is not disabled is supported by substantial evidence. *Moore,*

---

6  The Court recognizes that the ALJ misinterpreted the medical record as to Plaintiff's use of the cane.  Thus, the Court discounts this reason as a basis for finding Plaintiff not credible.  However, for the reasons stated in Section 1, the Court concludes this finding and any error committed is inapposite.
7  The Court agrees with the ALJ that the inconsistent work history "raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments."

405 F.3d at 1211.

## IX. CONCLUSION

Pursuant to the findings and conclusions detailed in this Memorandum Opinion, the Court concludes that the ALJ's non-disability determination is supported by substantial evidence and proper application of the law.  It is, therefore, **ORDERED** that the decision of the Commissioner is **AFFIRMED.**

A separate judgment is entered herewith.

DONE this 23rd day of March, 2016.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

(Tr.24).